UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SADARI IMARI BROWN,

               Plaintiff,                      CIVIL ACTION NO. 12-14829

          v.                          DISTRICT JUDGE ROBERT H. CLELAND

                                  MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 11, 14)**

Plaintiff Sadari Imari Brown challenges the Commissioner of Social Security's ("the Commissioner") final denial of her benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 11, 14); Plaintiff also filed a response (Dkt. No. 15). Judge Robert H. Cleland referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2).

## I.      RECOMMENDATION

Because the Administrative Law Judge ("ALJ") did not err in her assessment of the medical evidence of record, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

## II.      DISCUSSION

### A.  *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and

Supplemental Security Income are available only for those who have a "disability." *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment, which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.  *Administrative Proceedings*

Plaintiff applied for disability insurance benefits and supplemental security income on January 27, 2010, alleging a disability onset date of October 2, 2009; the Commissioner denied the application (Tr. 18). Plaintiff appeared with counsel for a hearing before ALJ Oksana Xenos, who considered the case *de novo* (*Id.*). In a written decision, ALJ Xenos found Plaintiff was not disabled (Tr. 18-32). Plaintiff requested an Appeals Council review (Tr. 12-14). On August 31, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 8-11).

### B. ALJ Findings

Plaintiff graduated from Western Michigan University with a Bachelor of Arts degree. She was 38 years old on her alleged onset date and has past relevant work as a sales clerk, general office clerk, contribution solicitor, and claims clerk (Tr. 31). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her alleged onset date in 2009 (Tr. 20).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: depression and anxiety (Tr. 20-21).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 21-22).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> a full range of work at all exertional levels but with the following nonexertional limitations: unskilled, routine, non-production-oriented, self-paced work with occasional contact with the general public, co-workers, and supervisors; cannot climb ladders, ropes, or scaffolds; should avoid concentrated exposure to fumes, odors, dusts, noxious gases, and poor ventilation; and should avoid hazards, such as moving machinery and unprotected heights.

(Tr. 22).

At step four, the ALJ found that Plaintiff could not perform any of her past relevant work (Tr. 30-31).

At step five, the ALJ found Plaintiff was not disabled, because she could perform a significant number of jobs in the national economy: sorter, industrial helper, and filler/packer (Tr. 31).

### C.  Administrative Record

#### 1.        Plaintiff's Hearing Testimony and Statements[1]

Plaintiff last worked as a retail sales associate; she was laid off (Tr. 43). She collected unemployment while she looked for a job in fundraising and development, a sector she hoped would make use of her Bachelor's degree in marketing (*Id.*). But she was unable to find any kind of work because no one was hiring (Tr. 43-44).

Plaintiff states she can no longer work because of her anxiety and depression (Tr. 42, 44). Though Plaintiff mentioned her heart problem (mitral valve prolapse) and asthma, neither causes her any physical problems (Tr. 47-48).

Plaintiff has anxiety attacks that occur three to four times a week, resulting in sweating, nervousness, and the sensation that her heart is going to beat out of her chest – she is unable to go out at these times  (Tr. 49). When Plaintiff has an attack, she tries to calm herself down, breathes deeply, and waits for it to pass – her attacks last five to ten minutes (*Id.*).

Plaintiff's depression renders her unable to get out of bed: two to three days a week, she does not "get up at all" (Tr. 52-53). Plaintiff was most recently hospitalized in November of 2010; although she had been taking her medications, she "went into a major depression and was not functional" (Tr. 48, 54). At the hospital, her medications were adjusted (Tr. 48). Since then, her medications have been adjusted when her symptoms recur (Tr. 49).

Her symptoms have persisted intermittently over the last two or three years; they are triggered by a "bad situation," such as her lack of employment (Tr. 44). And while she admitted that her depression was caused by her inability to find a job, she explained that she was treated

---

[1] Plaintiff's testimony before the ALJ reflects her subjective view of her medical condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

for depression while she was working and first began receiving treatment for depression during college (Tr. 44-45, 54). When asked whether she believed she had been getting better or worse since she last worked, Plaintiff responded: "I really believe that I – it stayed the same. It's not getting any better . . . . It's . . . basically stayed the same" (Tr. 56).

Plaintiff feels depressed and sluggish upon waking (Tr. 50); her sleeping medication makes her groggy in the morning (Tr. 52). It usually takes her about an hour or two to get out of bed (Tr. 50). Plaintiff also naps for two hours every day to rejuvenate (Tr. 50, 55): she sleeps five to six hours each night – her sleep medication helps – but, she awakens every few hours (Tr. 50). Overall, Plaintiff feels sluggish two or three times a day (Tr. 55).

Plaintiff regularly takes five different medications for her symptoms (Tr. 46, 55); they "help her to remain stable," but leave her feeling sluggish (Tr. 46, 52). One of her newer medications – Abilify[2] – was prescribed for her low energy (Tr. 53). She has been on it for approximately six months, but does not have more energy (Tr. 53). Plaintiff also sees her psychiatrist every month and her therapist every two weeks (Tr. 56). She calls in to her therapist whenever she needs extra help, and her therapist talks her through her concerns; this happens two or three times a month (Tr. 54).

Plaintiff lives with her mother and 14 year-old son (Tr. 42). She drives her son to school two or three times a week; on the days she cannot "get [her]self together," her mother takes him (Tr. 51). Plaintiff watches television until it is time to pick her son up from school, and helps him

---

[2] "[Abilify] is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia). It may be used alone or together with other medicines (e.g., lithium or valproate) for the acute or maintenance treatment of bipolar I disorder (manic-depressive illness). Additionally, it may be used together with other medicines for the treatment of major depressive disorder (MDD) in adults." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009101/?report=details (last accessed January 25, 2014).

with his homework in the evenings; she also attends church (Tr. 45). Plaintiff spends time with a

close friend (who lives nearby) three to four times a week; while Plaintiff was trying to find a

job, the two would go to the library together to job hunt using the library's computers (Tr. 47).

Her mother and son take care of most of the household chores; Plaintiff only cleans the bathroom

or washes dishes – she does not have the energy to do more (Tr. 51-52).

## 2.        Relevant Medical Evidence

On October 7, 2009, Plaintiff presented for an intake assessment at Eastwood Clinics

("Eastwood"); she felt herself slipping into a deep depression because of serious financial

problems (Tr. 421). Plaintiff had most recently treated at Eastwood in April of 2009 (*Id.*).

Plaintiff felt indecisive, anxious, and nervous; had poor concentration and an inability to focus;

found it difficult to take care of day to day tasks; and, had been unemployed since December of

2008 (she was receiving unemployment benefits) (*Id.*). A mental status examination revealed no

problems with memory; good insight and judgment; fair motivation; logical, coherent thought

process; depressed, sad, and anxious mood; and, cooperative behavior (*Id.*). She experienced

constant suicidal ideations, but had no plan or intent (Tr. 422). She was diagnosed with major

depression, recurrent (Tr. 423).

On October 9, Plaintiff reported wishing she were dead; feeling confused; and having

trouble with day to day functioning (Tr. 415).

On October 12, Oladayo Shobola, M.D., completed a psychiatric evaluation: Plaintiff

reported sleeping pretty well with medications; irritable and depressed mood; decrease in self-

esteem; no suicidal or homicidal ideations; poor concentration; increasing difficulty with ADL's

and organization; anxiety; low energy level; and, indecisiveness (Tr. 416, 419). A mental status

examination revealed calm motor activity; normal speech; cooperative behavior with good eye

contact; dysphoric mood; appropriate affect; organized and logical thought; no suicidal ideations;

no problems with memory; and, good insight and judgment (Tr. 418). She was diagnosed with

major depressive disorder, recurrent, with psychotic features, and assigned a GAF of 55 (*Id.*).[3]

Dr. Shobola recommended medication management and psychotherapy; Plaintiff was continued

on Seroquel,[4] Klonopin,[5] and Cymbalta,[6] and prescribed Lamictal[7] (Tr. 417).

_____

[3] The GAF score is:

> a subjective determination that represents the clinician's judgment of the individual's
> overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent
> danger of severely hurting self or others, persistent inability to maintain minimal personal
> hygiene, or serious suicidal act with clear expectation of death). . . . A GAF of 41 to 50
> means that the patient has serious symptoms . . . OR any serious impairment in social,
> occupational, or school functioning (e.g., no friends, unable to keep a job). A GAF rating
> of 51 to 60 signals the existence of moderate difficulty in social or occupational
> functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

[4] "[Seroquel t]reats schizophrenia and symptoms of bipolar disorder (manic-depressive illness). Used together with other medicines to treat major depressive disorder (MDD)." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011909/ (last accessed January 28, 2014).

[5] "[Klonopin] is [] used to treat panic disorder in some patients. Clonazepam is a benzodiazepine. Benzodiazepines belong to the group of medicines called central nervous system (CNS) depressants, which are medicines that slow down the nervous system." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/?report=details (last accessed January 29, 2014).

[6] "[Cymbalta t]reats depression, anxiety, diabetic peripheral neuropathy (nerve pain caused by diabetes), fibromyalgia (muscle pain and stiffness), or chronic (long-lasting) pain related to muscles and bones. This medicine is a selective serotonin and norepinephrine reuptake inhibitor (SSNRI)." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010059/?report=details (last accessed January 30, 2014).

[7] "[Lamictal] is used alone or together with other medicines to help control certain types of seizures (e.g., partial seizures, tonic-clonic seizures, or Lennox-Gastaut syndrome) in the

October 22, Plaintiff was hospitalized at the Milestones Program at Hope Behavioral
Health Services ("Milestones"); Dr. Harris[8] completed a psychiatric evaluation (Tr. 284-85).
Plaintiff was experiencing exacerbation of depression; she had poor ability to function and
financial stress, had become progressively worse in the previous two months, was having
suicidal ideations and crying spells, was not sleeping, and had lost weight (Tr. 284). Dr. Harris
diagnosed major depression, recurrent, without psychotic features; and assigned a GAF of 45
(Tr. 285).

On October 23, Plaintiff presented with a flat, blunted affect; depressed mood;
appropriate speech; anxious thoughts; and, no contemplation of self-harm, but some suicidal
thoughts (Tr. 281).

On October 26, Plaintiff was discharged from Milestones to a community crisis
stabilization program (Tr. 282). She lacked insight; areas of need or concern were "severe"; and,
her GAF was 45 (GAF upon admission was 20) (Tr. 282-83).

On October 27, a mental health assessment was completed at Macomb County
Community Mental Health (Tr. 324-34); the evaluation was signed by Tai Chung, M.D. (Tr.
334). Plaintiff left Milestones because she wanted to be home to care for her son; she had
symptoms of depression, crying spells, suicidal ideations, difficulty functioning and making
decisions, and was self-isolating (Tr. 327). A mental status examination revealed cooperative
behavior; unremarkable speech; normal perceptions; unremarkable thought process; dysthymic

---

treatment of epilepsy. This medicine cannot cure epilepsy and will only work to control seizures
for as long as you continue to take it. It can also be used in the treatment of bipolar disorder
(manic-depressive illness) in adults[.]" *See*
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010856/?report=details (last accessed
January 30, 2014).

[8] These treatment notes do not indicate Dr. Harris' full name or credentials.

mood; fair judgment; good impulse control; good insight; increased sleep; and, decreased appetite (Tr. 330-31). She was receiving mental health treatment at Eastwood (Tr. 331). She was diagnosed with major depressive disorder, recurrent, unspecified; assigned a GAF of 20; and, had a degree of disability in personal hygiene and self-care, self-direction, activities of daily living, and social transactions and interpersonal relationships (Tr. 332-33).

On October 28, Dr. Chung completed a psychiatric evaluation (Tr. 335-37). A mental status examination revealed normal speech; good eye contact; cooperative manner; retarded kinetics; blunted affect; racing thoughts; no memory impairment; no hallucinations or delusions; generally good judgment; good insight; and, motivation for treatment (Tr. 336). Dr. Chung noted that Plaintiff had just been discharged from Milestones with new medication; she was withdrawn and not eating (*Id*.). He diagnosed major depressive disorder, recurrent, unspecified; and assigned a GAF of 20 (Tr. 337).

On October 30, Dr. Chung completed a medication review (Tr. 338-43). The day before, Plaintiff had attempted to overdose by taking 10 Cymbaltas; she felt sorry for what she had done (Tr. 338). Plaintiff was otherwise compliant with her medications and indicated no side effects (*Id*.). Dr. Chung indicated normal speech; good eye contact; cooperative manner; normal kinetics; affect appropriate to mood; logical thought processes; no hallucinations or delusions; fair insight and judgment; no evidence of poor grooming and hygiene; moderate depressive mood (occasionally feels very depressed, or often feels somewhat depressed); moderate guilt feelings (feels very guilty or often moderately guilty); and, mild anxiety (occasionally feels moderately anxious) (Tr. 339-42). Records indicate a GAF score of 20; the adjacent date was October 22, 2009 (Tr. 343).

-11-

On November 2, Plaintiff was feeling okay, but still struggling (Tr. 344). Dr. Chung indicated that Plaintiff had normal speech; good eye contact; cooperative manner; retarded kinetics; affect appropriate to mood; no hallucinations or delusions; no evidence of poor grooming and hygiene; fair insight and judgment; very mildly blunted affect (occasionally seems indifferent to material that is usually accompanied by some show of emotion); moderate depressive mood; no guilt feelings; no latency of response; and, very mild anxiety (occasionally feels somewhat anxious) (Tr. 344-48). A GAF of 20 (dated as October 22, 2009) was again noted at the diagnosis portion of the exam (Tr. 349).

On November 6, Plaintiff was not feeling well; troubled by her son's behavior; depressed with thoughts of suicide; and, thought she needed to go to the hospital (Tr. 350). Dr. Chung indicated decreased speech; fair eye contact; guarded manner; retarded kinetics; affect appropriate to mood; logical thought processes; no hallucinations; very mild blunted affect; severe depressive mood; very mild guilt feelings; and, moderate anxiety (Tr. 351-355). Dr. Chung believed Plaintiff to be in a crisis situation; Plaintiff planned to self-admit herself to the hospital once she made arrangements for her son's care (Tr. 354). Her GAF, again most recently updated on October 22, 2009, was listed as 20 (Tr. 355).

That same day, Plaintiff was admitted to the hospital for suicidal ideations (Tr. 286-87). On November 7, Venkata Jasty, M.D., conducted a psychiatric admission evaluation (Tr. 296). Milestones had not helped Plaintiff: she reported feelings of depression; suicidal ideations; poor concentration and memory; significant anxiety; and, difficulty falling asleep (*Id.*). Examination revealed her to be alert, oriented, mesomorphic, in no acute distress; she had constricted affect, was depressed and overwhelmed, and exhibited no evidence of gross cognitive deficits (*Id.*) She

was diagnosed with major depressive disorder, severe, and generalized anxiety disorder with a history of panic attacks; she was assigned a GAF of 18-20. (*Id.*).

On November 8, Plaintiff complained of anxiety and severe depression; was overwhelmed by her 12-year-old son; had poor concentration, which caused her difficulty completing tasks; and, reported no active suicidal ideation (Tr. 305). She continued to take Seroquel, Paxil, and Klonopin (*Id.*). The next day, Plaintiff felt slightly better, but was still depressed (Tr. 304).

On November 11, Plaintiff stated that she would feel more comfortable having another day to stabilize, but denied any suicidal thoughts, plans, or intentions (Tr. 300). She was discharged that day with paperwork on manic depression (bipolar disorder) (Tr. 286-87, 293-94, 300).

A November 12 discharge summary (completed through intensive crisis stabilization at MCCMH) indicated admission diagnosis of major depressive disorder, recurrent, unspecified; and GAF of 20 (assessed on November 6, 2009) (Tr. 356-57). Discharge diagnoses were major depressive disorder, recurrent, unspecified and generalized anxiety disorder; GAF was listed as 20 (though it was most recently updated on November 9) (Tr. 356).

On November 23, Dr. Shobola saw Plaintiff for a medication review (Tr. 424). She was getting worse; her mood was dysphoric with appropriate affect; and, she denied hallucinations (*Id.*). Her medications were adjusted (*Id.*).

On November 26, Dr. Venkata completed a behavioral health discharge summary (Tr. 306-07). Plaintiff complained of poor sleep, concentration, and memory; her son was a source of stress (Tr. 306). She had been admitted to the inpatient psychiatric unit and provided individual

and group counseling; her symptoms improved with medication, and she denied any intent of harming herself (*Id.*). She was discharged once her symptoms were stable (*Id.*).

On December 21, Plaintiff presented to Dr. Shobola for a medication review (Tr. 425). She continued to feel depressed; had difficulty going out; experienced anxiety, low self-esteem, irritable and dysphoric mood, and low energy level; denied hallucinations; and, admitted daily suicidal ideations (*Id.*). Dr. Shobola recommended hospitalization (*Id.*).

That day, Plaintiff presented to the ER complaining of depression and suicidal thoughts; she planned to overdose on pills (Tr. 359, 361). A mental status exam indicated cooperative appearance; normal speech; goal-directed content and stream of thought; no hallucinations; normal neurovegatitive symptoms; low impulsivity level; cognitive insight; and, good judgment (Tr. 360). She was diagnosed with depression, major recurrent, assigned a GAF of 20, and admitted to inpatient psychiatry (Tr. 361). Plaintiff reported feeling overwhelmed by financial stressors and her son; she had four inpatient admissions since 2004; was last hospitalized in October due to an overdose; and, was receiving outpatient treatment at Eastwood with Dr. Shobola (Tr. 368).

Plaintiff was discharged on December 24 (Tr. 383). Her discharge summary indicates a GAF of 60 upon discharge (Tr. 385).

On January 23, 2010, Plaintiff presented to Eastwood for an intake assessment; her recent loss of unemployment benefits created a financial crisis that had exacerbated her symptoms of depression (Tr. 426). She was anxious, unable to complete daily tasks, withdrawn, afraid of leaving the house, and had lost significant weight (20 pounds in 60 days) (*Id.*). She had most recently treated at the Clinton Township location in October of 2009 (*Id.*). A mental status examination revealed guarded, distant behavior; poor eye contact; very flat affect (and depressed

-14-

mood); irrational fears; difficulty making decisions and possible slowed thought processes without delusions; poor judgment and minimal insight; and, motivation to feel better (Tr. 426). She was diagnosed with generalized anxiety disorder and major depressive disorder, and assigned a GAF of 60 (Tr. 428).[9]

On February 8, an Eastwood discharge summary was completed because Plaintiff had begun treating at a different Eastwood location; she had not made significant progress (Tr. 431). A GAF of 55 was assigned (*Id.*).

On February 9, Plaintiff reported severe anxiety; fear of leaving the house and living alone; and, inability to concentrate and make decisions (Tr. 432). Cymbalta was added to her medication regimen (*Id.*).

On March 9, Plaintiff's anxiety was still not improving; she feared going out alone (she needed someone to accompany her all of the time); and, it was a struggle for her to attend that day's medication review (Tr. 433, 464). Her medications were continued (Tr. 433).

Plaintiff continued to treat at Eastwood on May 7 (Tr. 463). On June 10, Plaintiff felt depressed, but not suicidal; she complained of weight loss (30 pounds, unintentionally) and her son's behavior continued to be an issue (Tr. 441, 462).

On June 26, Plaintiff continued to lack energy to complete tasks; was very depressed; denied any plans or intent to commit suicide; remained fearful; felt isolated from others; needed help reframing aspects of her depression so that she could avoid further decompensation; and, had struggled to find the motivation to attend support group (Tr. 460-61).

---

[9] The name of the psychiatrist who signed these treatment notes is illegible. But the same signature appears consistently on treatment notes from January 23, 2010 onward (*See, e.g.*, Tr. 432, 458).

-15-

On June 30, Plaintiff presented for medication review; she was still depressed (Tr. 459). She stated that she needed to find a job, but had no confidence in herself to find one (*Id*.).

On July 10, 2010, Plaintiff presented to Atul C. Shah, M.D. for a consultative examination (Tr. 453-55). She felt tired and depressed and reported no motivation; disturbed memory and sleep; lying in bed for days at a time; depression that had become worse over the last three to four years and lasts for weeks and months at a time; vague suicidal thoughts; and, anxiety attacks that make her feel anxious, nervous, sweaty and cause her heart to race and difficulty breathing (Tr. 453). She felt better when she took her medications (*Id.*). Dr. Shah indicated good contact with reality; fair insight; low self-esteem; a tendency to minimize symptoms; decreased motivation; spontaneous, organized, pressured speech; an overdose attempt in the fall of 2010, but no current plan; no mood swings or gross delusions; blunt affect; and, depressed, anxious, friendly and fearful emotional reaction (Tr. 454). Dr. Shah opined that Plaintiff had moderate to severe functional impairment for occupational activity because of major depression, which has been partially treated and panic disorder, which interfere with her ability to interact with the public, coworkers and family members; he diagnosed major depressive disorder (recurrent, in partial remission), chronic panic disorder, assigned a GAF of 60, and stated that Plaintiff's prognosis was fair (Tr. 455).

On July 29, Plaintiff again presented to Eastwood for a medication review (Tr. 458, 472). She was doing well on Abilify; her medication had been changed because Seroquel was not addressing her depression symptoms (*Id*.). She was not sleeping (*Id*.).

Plaintiff continued to treat at Eastwood on September 24 (mentally, she felt okay – she was not depressed; but she was tired all the time) (Tr. 471); September 27 (Tr. 467); and,

October 23 (reported being in need of a medication review) (Tr. 469-70). On October 26 (medication review), Plaintiff continued to feel depressed and anxious, but not suicidal (*Id.*).

On November 27, Eastwood referred Plaintiff to Community Mental Health because she had exceeded the annual benefit (she had used 20 visits in 2010); all further sessions were canceled pending approval of new insurance authorization (Tr. 465).

On November 30, Plaintiff was admitted to the hospital for suicidal thoughts and multiple depressive symptoms; she was diagnosed with major depressive disorder (rule out bipolar disorder) and assigned a GAF of 40 (Tr. 474). Upon discharge – December 6, 2010 – Plaintiff's mood was much better; she no longer had thoughts of suicide, but experienced some passive death wishes as late as the day before her discharge (*Id.*). The doctor commented that "[o]n the day of discharge, [she] stated that she was feeling much better and she felt ready to go, which was different from the prior hospitalization when she stated to me at least that she told the doctor she did not feel ready" (*Id.*). Plaintiff was discharged with prescriptions and supplies of Ativan,[10] Abilify, and Trazodone[11] (Tr. 475).

On December 30, a treatment plan review was completed at Eastwood (Tr. 501). Plaintiff had decompensated over the previous 45 days, and had been hospitalized; she had experienced difficulty stabilizing on medications prescribed in outpatient therapy (*Id.*). She had become more

_____

[10] "[Ativan t]reats anxiety, anxiety with depression, and insomnia (trouble sleeping). This medicine is a benzodiazepine." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010988/?report=details (last accessed January 30, 2014).

[11] "Trazodone is used to treat depression. It is thought to work by increasing the activity of serotonin in the brain. Trazodone is an antidepressant." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/?report=details (last accessed January 30, 2014).

engaged in working towards recovery; had expressed doubt about her progress due to decompensation; and had applied for SSI, a "major step in accepting mental illness" (*Id*.).

On April 11, 2011, a treatment plan review was completed at Eastwood (Tr. 499). Plaintiff exhibited an increase in her ability to function post-hospitalization; she had prescription adjustments, and sought help through MRS (*Id*.).[12]

### D. Plaintiff's Claims of Error

#### 1. Reliance on Evidence Before Plaintiff's Alleged Onset

Plaintiff first takes issue with the ALJ's affordance of controlling weight to GAF assessments – one from December 11, 2008, the other April 11, 2009 – rendered before her alleged onset date of October 2, 2009 (Dkt. No. 11 at p. 11).[13] She says that in relying on evidence prior to her alleged onset date, the ALJ committed reversible error. Defendant argues that the ALJ was reasonable in considering this evidence because Plaintiff testified that her condition remained consistent since she lost her job in December of 2008 (Dkt. No. 14 at p. 9).

The relevant portion of the ALJ's opinion states:

> Pursuant to a Discharge Summary dated December 11, 2008, a treating psychiatrist at Eastwood Clinics assessed an Axis V diagnosis/GAF score of 68[.]
> * * *

---

[12] "[Michigan Rehabilitation Services (MRS) works with eligible customers and employers to achieve quality employment outcomes and independence for individuals with disabilities. We work in partnership with individuals with disabilities to prepare for and obtain competitive employment, including exploring the possibilities of self-employment or owning a small business. Employment services to individuals with disabilities are provided in all 83 Michigan counties. MRS also assists employers find and retain qualified workers with disabilities. MRS helps employers save time and money, and maintain a motivated, reliable and dependable workforce." *See* http://www.michigan.gov/dhs/0,4562,7-124-5453_25392-272058--,00.html (last accessed January 30, 2014).

[13] All page numbers refer to CM/ECF pagination.

-18-

>The undersigned finds that this opinion is well supported by the objective and other substantial evidence of record and gives it controlling weight.
>
> \* \* \*
>
>The record reflects that the claimant was discharged from treatment at Eastwood Clinics on April 11, 2009, due to satisfactory completion of treatment goals. Discharge diagnoses of major depressive disorder, recurrent, and a GAF score of 70 were assessed.
>
> \* \* \*
>
>The undersigned finds that this opinion is well supported by the objective and other substantial evidence of record and gives it controlling weight.

(Tr. 24).

This Magistrate Judge agrees with Defendant: because Plaintiff testified that her condition had not changed since she last worked, the ALJ reasonably considered a broad view of the record to make a comprehensive assessment of Plaintiff's impairments. The ALJ's assessment is an accurate representation of the record evidence, and Plaintiff makes no argument otherwise. And, as Defendant points out, this discussion of evidence is but a few paragraphs in the ALJ's comprehensive 15 page opinion. As further explained below, any error in assigning the evidence controlling weight is harmless.

### 2.      The ALJ's Evaluation of Other GAF Scores

Plaintiff contends that the ALJ misappropriated weight to the GAF scores assessed by various medical sources. She discusses GAF sores during the relevant time period, and concludes that it is "apparent that the ALJ accepted the opinions of anyone who assessed a GAF score of 55 or more as supported by substantial evidence, while rejecting the opinion of anyone assessing a lesser score despite an equal if not greater level of evidentiary support" (Dkt. No. 11 at p. 15).

GAF scores are a subjective rather than an objective assessment and, as such, are not entitled to any particular weight. *See Kornecky*, 167 F. App'x at 511. "GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health

status from 0 to 100, with lower scores indicating more severe mental limitations." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." Furthermore, the Commissioner "has declined to endorse the [GAF] score for use in the Social Security and SSI disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x. 411 (6th Cir. 2006) (internal quotations omitted) (affirming ALJ's decision denying benefits where treating physician assessed the claimant a GAF score of 50).

Put simply, a GAF score is "not a rating of [a claimant's] ability to work." *See Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007); *Kornecky*, 167 F. App'x at 511 ("[A]ccording to the [Diagnostic and Statistical Manual] . . . , a [GAF] score may have little or no bearing on the subject's social and occupational functioning . . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place."). Accordingly, the Sixth Circuit has affirmed denials of disability benefits where applicants have had GAF scores of 50 or lower. *See, e.g.*, *Smith v. Comm'r of Soc. Sec.*, No. 02-1653, 2003 WL 22025046, 74 F. App'x 548 (6th Cir. Aug. 27, 2003) (GAF score of 48); *Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358 (6th Cir. 2001) (GAF score of 35); *Thurman v. Apfel*, 211 F.3d 1270 (6th Cir. 2000) (GAF score of 50). Any errors in the ALJ's analysis of GAF scores are harmless because substantial evidence supports the ALJ's RFC and ultimate determination that Plaintiff is not disabled.

Plaintiff's primary claims of error relate to the ALJ's reasons for assigning weight to specific GAF scores.

First, Plaintiff argues that the ALJ erred in affording controlling weight to Dr. Shobola's October 12, 2009 GAF assessment of 55 because he was not a treating source at the time the GAF was assessed: Plaintiff had not been to the clinic in several months, and her prior visits to the clinic did not include Dr. Shobola's signature (Dkt. No. 11 at p. 12). Defendant concedes that, at the time of the GAF assessment, Dr. Shobola had not yet established a longitudinal treatment relationship with Plaintiff.

Second, Plaintiff argues the ALJ erroneously afforded limited weight to the GAF score of 45 assessed by Dr. Harris when she was admitted to Milestones on October 22, 2009 (Dkt. No. 11 at p. 12, citing Tr. 25, 284). The ALJ stated the following with respect to Dr. Harris:

> Given that the above GAF is not well supported by either objective or other substantial evidence of record, the undersigned gives it limited weight. Further, it does not appear that a treating relationship existed between the claimant and the examining physician. Finally, the medical credentials of the examiner are not apparent from the face of this record

(Tr. 25). Plaintiff states that Dr. Harris was no more a treating source than Dr. Shobola: "[Dr. Harris] saw [P]laintiff on at least a single occasion, just as did [Dr. Shobola] 10 days earlier" (Dkt. No. 11 at p. 13). Plaintiff also takes issue with the ALJ's rationale regarding Dr. Harris' unspecified credentials. Defendant responds that "Dr." can signify a variety of training (e.g., Ph.D, D.O., M.D., or Ed.D).

Plaintiff next argues that the ALJ erred in affording only minimal weight to the GAF scores of 20 assessed around the time she was hospitalized for suicidal ideations in November of 2009, because these assessments are consistent with GAF scores assessed in October 2009 (Dkt. No. 11 at pp. 13-14, citing Tr. 26). This particular contention, however, narrows in on only a

-21-

small portion of the relevant time period, which, as discussed below, the ALJ did not fail to consider.

The errors in the ALJ's assignment of weight to GAF scores – if any – are harmless. To the extent that the ALJ based her decision in part on an evaluation of Plaintiff's GAF assessments over time, a careful review of the record as a whole demonstrates that, during the majority of the relevant time period, Plaintiff was consistently assessed GAF scores that support the ALJ's ultimate determination. Plaintiff was assessed a GAF score of 60 in December 2009 upon discharge from the hospital; a GAF score of 60 upon review in January 2010 by the psychiatrist at Eastwood (Tr. 428);[14] a GAF score of 55 on February 8, 2010 at Eastwood (Tr. 431); and, a GAF score of 60 by Dr. Shah during his consultative examination in July of 2010 (Tr. 453-55). *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009) ("A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning." (internal quotations and citations omitted)); *Smith v. Comm'r of Soc. Sec.*, 4823 F.3d 873, 876 (2007) (GAF scores in the high 40s to mid 50s were not inconsistent with an ability to perform simple, unskilled, low stress work). Following Plaintiff's hospitalization in December of 2009 – only two months after her alleged onset date – only one medical source assessed a lower score: a GAF score of 40 upon her November 2010 inpatient admission (Tr. 474).

---

[14] Plaintiff also argues that the ALJ erred in affording controlling weight to this GAF score because it was rendered by a social worker – which is not an acceptable medical source – and, it was rendered "on [her] first day back," and therefore was not the product of an ongoing treatment relationship (Dkt. No. 11 at p. 14). But, Plaintiff treated with Eastwood Clinics in November and December of 2009. While it does appear that the GAF was written by the same person that signed the line denoting "Therapist Signature/Credentials," a psychiatrist also signed the evaluation; it is reasonable to assume coordinated care between the two professionals (Tr. 428). But again, this error – if any – is harmless.

Although peculiar that the ALJ would place so much emphasis on GAF scores in the first place, the ALJ's consideration of the record was not limited to GAF scores alone: she also discussed relevant treatment notes throughout the period of alleged disability. For example, on October 25, 2009, Plaintiff reported a higher anxiety level in the mornings that decreased as she performed ADLs and chores during the day (Tr. 26); and on July 29, 2010, she was doing well on Abilify (Tr. 28). The ALJ also noted Plaintiff's most recent treatment notes of record, those from April 11, 2011 (Tr. 29), which indicated that Plaintiff was exhibiting an increased ability to function post-hospitalization and was seeking help through Michigan Rehabilitation Services (Tr. 499).[15]

Plaintiff secondarily asserts reversible error because the ALJ neglected to explicitly mention other GAF scores.

She argues that the ALJ erred in failing to mention the GAF scores of 20 assessed on December 24, 2009 (Tr. 261, 383-85), which were "remarkable for their consistency with the GAF score of 20 recorded" on December 21, 2009 (Dkt. No. 11 at p. 14). But treatment notes indicate that her GAF was assessed at 60 upon discharge on December 24, 2009 (Tr. 383-85). Nor does it seem that the ALJ choose to ignore the GAF of 20, while crediting a higher GAF score: she likewise failed to mention the GAF of 60 that was assessed upon discharge (Tr. 385). And, as discussed herein, the ALJ did not fail to consider the period of hospitalization (Tr. 27).

Similarly, Plaintiff takes issue with the ALJ's failure to explicitly state that Plaintiff was assessed a GAF score of 40 upon admission for psychiatric hospitalization in November of 2010 (Tr. 474). But, the ALJ did not neglect to mention this hospitalization either; she discussed it at

---

[15] *See supra* n. 12.

length, and noted that Plaintiff stated she was ready to leave on the day she was discharged (Tr. 28).

Moreover, the ALJ did not ignore the evidence related to the periods of time during which Plaintiff was assessed relatively low GAF scores: in addition to discussing in sufficient detail each instance of Plaintiff's inpatient treatment, the ALJ also discussed evidence of decompensation at Step Three. She stated that "[t]he record reflects that the claimant had fewer than three episodes [of decompensation] within one year, which episodes occurred at intervals greater than every four months on average, and which lasted for less than two weeks" (Tr. 22). Plaintiff does not dispute this representation of the evidence.

"Any failure to reference Global Assessment Functioning scores or to compare different scores attributed to the same subject, without more, does not require reversal."*DeBoard*, 211 F. App'x at 416. Furthermore, "it is well settled that: '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky*, 167 F. App'x at 507 (internal citation omitted). "The fundamental question . . . is whether the ALJ's decision is supported by substantial evidence." *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 468 (6th Cir. 2004). Because the ALJ's decision is supported by substantial evidence, any errors are harmless. *See id.*, 112 F. App'x at 468.

The ALJ also did not ignore any treating source opinion on Plaintiff's functional abilities; no treating source rendered such an opinion. Dr. Shah, however, provided a consultative opinion not inconsistent with the ALJ's RFC. He stated that Plaintiff had moderate to severe functional impairment for occupational activity because of major depression, which has been partially treated and panic disorder, which interfere with her ability to interact with the public, coworkers and family members; he diagnosed major depressive disorder (recurrent, in partial remission),

-24-

chronic panic disorder, assigned a GAF of 60, and stated that Plaintiff's prognosis was fair (Tr. 455).

The ALJ discussed Dr. Shah's opinion and explained her assessment of it:

The undersigned finds that this opinion is mostly well supported by the objective and other substantial evidence of record and gives it significant weight to the extent that it is not inconsistent with the [RFC] assessed herein, and again noting the non-treating status of the examiner.

(Tr. 28).

But Plaintiff argues that the ALJ's assignment of "significant weight" is another example of the ALJ's arbitrary analysis of the evidence: "once again the ALJ adopted the opinions of a physician with no established treating relationship with plaintiff, but failed to explain why his opinion was more valid than that of others who actually were treaters but who had not established a long-term treating relationship" (Dkt. No. 11 at p. 15). Plaintiff states that contrary GAF scores discredit the ALJ's assertion that the opinion is well supported by the record. But, as discussed above, this argument –based entirely on the low GAF scores assessed during Plaintiff's short periods of decompensation –lacks merit.

The record also contains a July 27, 2010 mental RFC assessment from non-examining consultative physician, J. Gange, Ph.D. (Tr. 69-71). Upon review of Plaintiff's medical records, he opined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; and, interact appropriately with general public ("[claimant] can relate on at least a superficial basis on an ongoing basis [with] co-workers and supervisors") (Tr. 69-70). Dr. Gange stated that Plaintiff could manage the stresses involved in a simple work environment (Tr. 70-71). He also concluded that Plaintiff was capable of following simple instructions on a consistent basis, and that her

record did not fully support the limitations expressed in function reports from Plaintiff and her mother (Tr. 67-68).

The ALJ incorporated significant mental limitations into Plaintiff's RFC, consistent with both opinions: in part, Plaintiff was to be limited to unskilled, routine, non-production-oriented, self-paced work with occasional contact with the general public, co-workers, and supervisors (Tr. 22). Notably, Plaintiff does not argue that the ALJ's ultimate RFC fails to sufficiently account for her non-exertional limitations. Nor does Plaintiff contest the ALJ's adverse credibility determination, which provided a comprehensive discussion of the ALJ's reasons for finding Plaintiff only partially credible: among them, her receipt of unemployment benefits until January 2010; notations in treatment records that indicate Plaintiff continued to seek employment well into the relevant time period; and, daily activities that include driving, taking her son to school, and helping him with his homework (Tr. 30). The ALJ reasonably concluded that Plaintiff's impairments did not render her unable to work.

Although a close call, a thorough evaluation of the record reveals the ALJ's decision to be permissibly within the zone of choice afforded ALJs in social security disability determinations. *See Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). It should not be disturbed on appeal.

### 3.        Plaintiff's Capacity for Sustained Work

Plaintiff next argues that the ALJ disregarded Plaintiff's periods of decompensation, which demonstrate her inability to work on a regular and continuing basis. *See* 20 C.F.R. §§ 404.1545(b)-(c). However, as discussed above, the ALJ did not disregard evidence of Plaintiff's inpatient hospitalizations.

-26-

IV.     CONCLUSION

Because the ALJ did not err in her assessment of the medical evidence of record, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. *See* Fed.R.Civ.P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  February 4, 2014

### Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, February 4, 2014, by electronic and/or ordinary mail.

s/Eddrey Butts
Case Manager for Magistrate Judge Mark A. Randon